Augustine **MARTINEZ, et al., Plaintiffs,**

v.

**SONOMA–CUTRER VINEYARDS, et al., Defendants.**

No. C–82–5718–WWS.

United States District Court,
N.D. California.

Dec. 5, 1983.

David C. Lewis, Deanna Beeler, David Grabill, California Rural Legal Assistance, Santa Rosa, Cal., Gregory F. Jilka, Sebastopol, Cal., for plaintiffs.

Randolph C. Roeder, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for Sonoma-Cutrer Vineyards, Inc.

R. Barry Churton, Cooper, White & Cooper, San Francisco, Cal., In association with Littler, Mendelson as counsel for Sonoma-Cutrer & A. Robledo.

Jeffrey A. Little, Tarkington, Carey, O'Connor & O'Neil, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

This action is before the Court on defendants' motion for summary judgment.[1] The motion was filed at the Court's suggestion following a lengthy pretrial conference at the conclusion of which it appeared that plaintiffs' federal law claims are barred as a matter of law. Plaintiffs were given leave to file an additional memorandum and declarations in opposition and have done so.

### THE MATERIAL FACTS

The Court accepts for purposes of this motion plaintiffs' factual summary which is as follows:

Most of the facts of this action are undisputed. Plaintiffs were employed as farmworkers by Sonoma-Cutrer Vineyards near Windsor in Sonoma County. All but three plaintiffs were living in housing provided by their employer. Most had lived there for many months; some for several years.

In the course of the 1982 grape harvest, a dispute arose between the workers and the vineyard about wages. The workers had been promised $50.00 per ton for picking grapes. When they received their first paychecks, they calculated that the employer was paying

about $30.00 per ton. On September 5 and 7, 1982, they protested the discrepancy to company officials; on the latter day, they were told not to return to work unless they were willing to accept an amount substantially less than $50.00 per ton. On the morning of September 8, 1982, plaintiffs again reported for work at about 6:00 a.m. and requested that the employer abide by the earlier agreement concerning pay. The ranch foreman, Arturo Robledo, told plaintiffs and their co-workers that they were fired and to get off the ranch immediately. Robledo's brother, Reynaldo, brandished a gun at the workers.

Plaintiffs, Servin and Alfaro, left the scene to call the Sheriff's Department for help. The sheriffs had already been contacted by the company, because they encountered a sheriff's car parked about one-quarter mile down the road near the entrance to the ranch. Within a few minutes, more sheriff's cars and a California Highway Patrol unit arrived and drove up to where the other plaintiffs were talking to company officials. The sheriffs deputies were under the command of Sergeant Mark Ihde, Watch Commander of the department. They arrived on the scene at approximately 7:00 a.m. Sergeant Ihde spoke with company officials. Shortly thereafter, groups of replacement workers were brought in by the company. These men proceeded out into the grape fields without incident. At approximately 7:30 a.m., Sergeant Ihde advised company officials that his men would have to leave shortly; further, that there was a possibility of a confrontation between the old workers (including plaintiffs) and the replacement workers if the old workers were still on the ranch premises. He suggested to company officials that plaintiffs and the other old workers be ordered to vacate their housing and leave the premises or

1. The remaining defendants in the action are the County of Sonoma, Sheriff Roger McDermott, and Deputy Sheriffs Mark Ihde, Fred Enos, Terry Kelly, Chuck Laver, Carl Dennis, Sanford Geaslin, Rob Pacheco, Barbara Moberg, and Harvey Head.

face arrest for trespassing. Company officials, relying on Sergeant Ihde's expertise, agreed to do so.

At approximately 7:45 a.m., Sergeant Ihde informed the plaintiffs that unless they vacated their housing and left the premises by 8:00 a.m., they would be arrested for trespassing. Some of the plaintiffs fearing arrest, left immediately; others waited. A few minutes later, a sheriffs department "Transport Van" arrived, and an Identification Technician set up field booking equipment. Deputies began advancing towards the plaintiffs.

At that point, plaintiffs began to gather their belongings from their housing. Deputies came into their living quarters with night sticks drawn saying in a loud voice, "Let's go." Plaintiffs hurriedly packed what belongings they could carry, and left the ranch. Some drove, some walked. All were in fear that they would be arrested, assaulted, jailed and suffer other harm. By 8:30 a.m., all the plaintiffs had been evicted from premises.

At no time did the Deputies observe any crimes being committed by the plaintiffs. The reason given by Sergeant Ihde for the evictions in his deposition was the possibility of a confrontation later in the day between the old workers and the replacements.

Sheriff McDermott, and Captain Hess both stated that Sergeant Ihde had done nothing wrong; had acted in a manner wholly consistent with the Department's policies and procedures; that no changes had been made in those policies or procedures as a result of this incident; that no disciplinary action had been taken against Sergeant Ihde or other members of the department as a result of the September 8 incident. All officers involved denied there had been any wrongdoing whatsoever on the part of the sheriffs; all said if a similar situation arose in the future, they would do the same thing.

The plaintiffs' damages in terms of lost housing, lost personal property and out of pocket expenses are significant to them, although relatively small by other standards. They have suffered considerable mental anguish, humiliation and fear as a result of the incident. (Plfs. Pretrial Statement pp. 2–4)

## DISCUSSION

Plaintiffs base their § 1983 claim on the contention that they were unlawfully evicted from their premises without being given the benefit of the unlawful detainer procedure to which they claim to be entitled. Cal.Code of Civil Procedure, § 1161 *et seq.* In this fashion, they contend, they were deprived of a property interest without due process of law.

Section 1161 defines unlawful detainer as the holding over by a "tenant of real property." A tenant is defined to "include[ ] any person who hires real property" except transient occupants of hotels or motels. While the California courts have not addressed the specific issue before the Court, there has been a general assumption that the existence of a "conventional relationship of landlord and tenant" is a prerequisite to the unlawful detainer procedure. *Cavanaugh v. High,* 182 Cal.App.2d 714, 6 Cal.Rptr. 525, 526 (1960).

The undisputed facts establish that the employer provided for use by plaintiffs a barracks consisting of one large room with two sets of partitions reaching half way to the ceiling and no doors. Bunks are located at each end with a stove and picnic table in the center, and a bathroom alongside. Plaintiffs stayed in the barracks for their own and the employer's convenience but were not required to do so; the fields in which they worked are nearby. Only single men used the barracks, but they stayed there at all times, even when not working in the employer's fields. The men fixed their meals on the stove in shifts. Occasionally the foreman inspected the interior of the barracks. The men paid no rent and had no lease or other formal arrangement governing their occupancy. It was understood, however, that their right to occupy

the barracks ended when they were terminated.

■ It is assumed that § 1161 applies to the case of an employee occupying employer-furnished housing whose right to occupy it has terminated along with his employment, regardless of whether he had an obligation to pay rent. It is extremely doubtful, however, that it applies to the case of workers occupying bunks in a barracks remaining under the supervision and control of the employer through its foreman. The absence of specified premises assigned for the exclusive occupancy of a particular person or persons with the capacity and right to exclude others from entering would seem to preclude the existence of anything resembling a conventional landlord-tenant relation. The Court therefore holds that plaintiffs are unable to establish the existence of a protected property interest.

■ Regardless of the Court's ultimate decision on whether plaintiffs were entitled to the unlawful detainer procedure, however, it is indisputable that the question is a close and difficult one. Defendants are therefore entitled to the protection of the good faith immunity defense under *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982):

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[2]

The undisputed facts establish that the defendant deputies were lawfully on the property, having been called to forestall any altercation between the striking employees and their replacements. Viewing the facts in the light most favorable to plaintiffs, the deputies evicted plaintiffs when they declined to leave voluntarily. As the foregoing discussion shows, these plaintiffs in their peculiar circumstances had no "clearly established statutory or constitutional rights of which [defendants] would have known" to remain on the premises. Even if the deputies were found to have violated plaintiffs' rights by evicting them, therefore, the vague and uncertain nature of those rights under these circumstances makes this an appropriate case for qualified immunity.

■ Plaintiffs' claim must be dismissed for an additional, independent reason. Under *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), state tort remedies for wrongful deprivation of property were held to satisfy due process requirements, precluding an action under § 1983. In *Haygood v. Younger*, 718 F.2d 1472 (9th Cir.1983), the court of appeals held *Parratt* to apply "to situations in which process prior to deprivation of liberty would not be feasible or practicable." (At 1480) That rule governs deprivation of property as well. It applies here because it clearly would not have been practicable to institute some formal adjudicatory process before the sheriff's deputies could clear the property in the face of a possible altercation.

Plaintiffs contend that the situation the deputies faced failed to present the need for swift and decisive action overcoming the obligation to comply with the unlawful detainer procedure on which the *Haygood* decision is premised.[3] The undisputed facts refute that contention. The fact that *both* sides, fearing violence, had summoned the deputies to the vineyard, combined with the deputies' knowledge of and past experience with such labor disputes, provided them with a basis for their decision to clear the property. The Court finds this basis

---

2. In *Harlow,* the Court noted specifically that the defense is properly raised and considered on summary judgment. 457 U.S. at 818, 102 S.Ct. at 2738. In this case, there is no disputed issue of material fact; application of the defense involves only a question of law. *Cf. Haygood v. Younger,* 718 F.2d 1472 (9th Cir.1983).

3. Inasmuch as the analysis of this final ground proceeds independently of the first two, the Court assumes here for the sake of argument that plaintiffs would have been entitled to the protection of the unlawful detainer procedures.

adequate as a matter of law to justify bypassing plaintiff's otherwise available predeprivation remedies, so long as state law provides adequate postdeprivation relief.

That being so, the question is whether the available post-deprivation remedies under state law are constitutionally adequate. As plaintiffs' amended complaint shows, plaintiffs may recover damages from these defendants under Government Code § 912.-4, in addition to other possible theories. There is nothing to suggest that these provisions do not amount to a constitutionally adequate remedy. *See Engblom v. Carey,* 677 F.2d 957, 964–66 (2d Cir.1982).[4]

For each of the foregoing reasons, the Section 1983 claim must be dismissed.

Plaintiffs have come forward with no facts nor do they now contend that the conduct of these defendants denied plaintiffs their rights on the basis of race or nationality, in violation of §§ 1981 or 1985(3). These claims must also be dismissed.

Accordingly, judgment will be entered for the defendants named in note 1, above, on plaintiffs' first, second and third claims for relief upon the condition stated in note 3, above. The remaining claims are dismissed without prejudice for the reasons stated in *United Mine Workers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

IT IS SO ORDERED.

---

4. The judgment will be conditioned on defendants' execution of a consent by which all statutes of limitations applicable to state law claims shall be deemed to have been tolled during the pendency of this action.